IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABCELLERA BIOLOGICS INC. and THE UNIVERSITY OF BRITISH COLUMBIA, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| BERKELEY LIGHTS, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs AbCellera Biologics Inc. ("AbCellera") and The University of British Columbia ("UBC") (collectively, "Plaintiffs"), hereby demands a jury trial and allege the following against Defendant Berkeley Lights, Inc. ("Berkeley" or "Defendant"):

## NATURE OF ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq*.

2.      Plaintiffs have filed this lawsuit to stop Berkeley's unlawful infringement of Plaintiffs' patented inventions and to obtain damages, an injunction, and other relief.

## THE PARTIES

3.      AbCellera Biologics Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its principal place of business located 2215 Yukon Street Vancouver, BC V5Y 0A1.

4.      University of British Columbia is a corporation continued under the *University Act* of British Columbia with offices at #103-6190 Agronomy Road, Vancouver, British Columbia, V6T 123.

5.     On information and belief, Berkeley is incorporated under the laws of the State of Delaware, and has a place of business at 5858 Horton St #320, Emeryville, CA 94608.

## JURISDICTION AND VENUE

6.     This is an action for patent infringement arising under the patent laws of the United States of America, 35 U.S.C. § 1, et. seq., including 35 U.S.C. § 271.  This Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.     This Court has personal jurisdiction over Berkeley based at least on Berkeley's incorporation in the State of Delaware.

8.     Venue is proper in this Court under 28 U.S.C. § 1400(b) because Berkeley is incorporated in, and therefore resides in, the State of Delaware.

## FACTUAL BACKGROUND

### A.  AbCellera's Technology

9.     AbCellera is a biotechnology company with a pioneering and proprietary drug discovery platform that searches and analyzes natural immune systems to find antibodies that can be used to prevent and treat disease.  AbCellera's technology, which combines high-throughput microfluidics, hyper-scale data science, machine learning, bioinformatics, and genomics, identifies new first-in-class drugs and significantly reduces the time it takes to bring treatments to the clinic.

10.     Plaintiffs developed and patented the use of microfluidic devices for high-throughput single-cell secretion assays that can be applied to antibody discovery and cell clone selection.  These include assays such as live-cell binding, specificity, cross-reactivity, affinity, receptor blocking and function.  Plaintiffs have also developed and patented methods for isolating the sequences of an antibody that reacts with a disease related antigen and to identify an antigen that mediates a disease state.  This groundbreaking technology allows for the screening and analysis of millions of B cells on an individual, cell-by-cell, basis to identify antibodies with rare

therapeutic properties.  AbCellera recently demonstrated its market leading efforts by discovering the first antibody against COVID-19 that was the first antibody to enter human clinical trials anywhere in the world.  AbCellera's technology enabled the discovery and first dose of a therapeutic antibody in less than ninety days.

**B. The Patents-in-Suit**

11.    On September 15, 2020, the United States Patent and Trademark Office ("the USPTO") duly and legally issued U.S. Patent No. 10,775,376 ("the '376 patent"), titled "Methods for assaying cellular binding interactions."  The inventors of the '376 patent are Anupam Singhal, Carl L. G. Hansen, John W. Schrader, Charles A. Haynes, and Daniel J. Da Costa.  UBC is the assignee of the '376 patent.  AbCellera is the exclusive licensee of the '376 patent with the right to sue for past and present infringement and to collect damages.  A true and accurate copy of the '376 patent is attached hereto as Exhibit 1.

12.    On September 15, 2020, the USPTO duly and legally issued U.S. Patent No. 10,775,377 ("the '377 patent"), titled "Methods for assaying cellular binding interactions."  The inventors of the '377 patent are Anupam Singhal, Carl L. G. Hansen, John W. Schrader, Charles A. Haynes, and Daniel J. Da Costa.  UBC is the assignee of the '377 patent.  AbCellera is the exclusive licensee of the '377 patent with the right to sue for past and present infringement and to collect damages.  A true and accurate copy of the '377 patent is attached hereto as Exhibit 2.

13.    On September 15, 2020, the USPTO duly and legally issued U.S. Patent No. 10,775,378 ("the '378 patent"), titled "Methods for assaying cellular binding interactions."  The inventors of the '378 patent are Anupam Singhal, Carl L. G. Hansen, John W. Schrader, Charles A. Haynes, and Daniel J. Da Costa.  UBC is the assignee of the '378 patent.  AbCellera is the exclusive licensee of the '378 patent with the right to sue for past and present infringement and to collect damages.  A true and accurate copy of the '378 patent is attached hereto as Exhibit 3.

14.     The '376 patent, the '377 patent, and the '378 patent are collectively referred to as the "Patents-in-Suit."

**C. Berkeley's Accused Products and Services**

15.     On information and belief, Berkeley sells and manufactures products, and provides services, related to the "[d]iscovery of cellular therapies, biopharmaceuticals, and other cell-based products." (https://www.berkeleylights.com/, a true and correct copy is attached as <u>Exhibit 4</u>.) On its website, Berkeley states that its technology allows for individual cells to be:

> isolated, cultured, assayed and exported. Each cell or clone is imaged and monitored in real-time in a NanoPen™ chamber on our OptoSelect™ chips to provide rich visual data early and often. Our full platform and software suite deliver cell processing and deep profiling with more information about cell function than any other technology.

(https://www.berkeleylights.com/technology/, a true and correct copy is attached as <u>Exhibit 5</u>.)

16.     On information and belief, Berkeley sells the Beacon® Optofluidic System along with associated technology and provides services utilizing the Beacon® Optofluidic System (collectively "the Beacon®"). The Beacon® is an automated system that can be used for antibody discovery, cell line development, synthetic biology, and cell therapy development workflows. (https://www.berkeleylights.com/systems/beacon/, a true and correct copy is attached as <u>Exhibit 6</u>.) On information and belief, the image below illustrates the Beacon®.



17.     On information and belief, Berkeley sells the Beacon® for use in its antibody discovery workflow, "The Opto Plasma B Discovery Workflow." (https://www.berkeleylights.com/workflows/antibody-discovery/, a true and correct copy is attached as Exhibit 7.)

18.     Berkeley states that using its workflow, "Plasma B cells are screened using binding and functional assays to select only the most qualified antibody lead candidates." (*Id.*)

19.     Berkeley states that "Opto Plasma B Discovery Workflow enables down-selection of lead candidates through multiple assays for antigen specificity and function." (*Id.*) The assays are illustrated in the image below:

**ASSAYS THAT RUN IN OUR NANOPEN CHAMBERS**



**Functional Assay**



**Ligand Blocking Assay**



**Cross-Species Assay**



**Antigen Specific Bead Assay**

(*Id*.)

20.     On information and belief, the assays are run in NanoPen™ chambers that have a volume of 250 picoliters.  Berkeley states the size of the NanoPen™ chambers "means a single cell can be isolated and assayed in its own discrete chamber." (https://www.berkeleylights.com/systems/beacon/, a true and correct copy is attached as Exhibit 6.)

21.     Berkeley includes the following visual representation of a NanoPen™ chamber on its website:



22.     On information and belief, the NanoPen™ chambers are contained on Berkeley's OptoSelect chips.  Berkeley states that "each OptoSelect chip contains thousands of NanoPen chambers."  Berkeley states that the NanoPen chambers are "where cells are deposited, where they grow and where they are characterized using a myriad of proprietary Berkeley Lights assay." (*Id.*)

23.     On information and belief, Berkeley sells several types of OptoSelect chips, including the OptoSelect 1750 Chip, OptoSelect 3500 Chip, and OptoSelect 11k Chip.  (*Id.*)  On information and belief, Berkeley also sells reagents and software for use with the Beacon®.  (*Id.*)

24.     On information and belief, "each nanofluidic chip contains 1758 NanoPen chambers arrayed along four continuous channels.  The NanoPens have a narrow opening to the channel for nutrients and cellular waste diffusion."  (Amgen White Paper – a true and correct copy is attached as Exhibit 8.)  Representative images of the NanoPens on the nanofluidic chips are presented below:



(*Id.*)

25.    On information and belief, the Beacon® provides for "bead and diffusion-based fluorescent assays can be adapted for scoring secreted antibody on chip.  Thus, relative protein productivity can be established on the instrument and only clones with acceptable productivity can be selected for export to microtiter plates and scaled-up for further studies.  Captured data can then combined to document cell growth measurements, proof of clonal origin, single-cell secretion, and overall population compositions."  (2019 Biotech Paper – a true and correct copy is attached as Exhibit 9)

26.    On information and belief, antibody-secreting cells ("ASCs") can be microfluidically imported into the chip and sequestered into individual NanoPens for screening via gravity.  On information and belief, ASCs that secrete antigen-specific IgG can be detected using a bead-based, two-color fluorescent binding assay that produces a characteristic fluorescent bloom.  On information and belief, individual cells of interest can then either be lysed in the NanoPens with nucleic acids being captured for further analysis and sequencing or can be removed from the NanoPens and exported from the chip directly into 96-well plates containing cell lysis

buffer.  (2019 Winters et al. – a true and correct copy is attached as <u>Exhibit 10</u>)  On information and belief, the below is a schematic of the Beacon workflow for antibody-discovery:



**Figure 2.** NanOBlast on-chip screening.  (a). Cartoon schematic and representative brightfield image of the channel and nanopen space depicting the homogenous bead-based assay design for detection of IgG secretion and antigen specificity in the channel of the OS3500 chip. 3.2-micron polystyrene beads precoated with goat anti-murine IgG, Fc-specific polyclonal antibodies were mixed with AF 568-labelled, goat, anti-murine IgG H+L-specific, polyclonal antibodies; biotin-labelled therapeutic human IgG; streptavidin AF 647; and 10% human serum were imported into the channel space of the chip via onboard fluidics. (b). 45-min (final in the assay series) images of all 21 FOV stitched together depicting the blooms generated for the IgG secretion AF 568 signal as captured in the TRED filter cube of the Beacon. Magnification view of 60 individual nanopens on the chip demonstrating fluorescent bloom formation at the mouth of the nanopen. Time course of bloom formation for nanopen 928 (done 1A3) demonstrating the change in intensity and size over the duration of the screen. (c). 45-min (final in the assay series) images of all 21 FOV stitched together depicting the blooms generated for the antigen-specific secretion AF 647 signal as captured in the Cy5 filter cube of the Beacon. Magnification view of 60 individual nanopens on the chip demonstrating fluorescent "bloom" formation at the mouth of the nanopen. Time course of bloom formation for nanopen 928 (clone 1A3) demonstrating the change in intensity and size over the duration of the screen. (d). 45-min timepoint images for antigen specificity and IgG secretion of the 13 nanopens from recovered mouse IgGs after constraining the panel to only single exported ASCs.

(*Id.* at 1027.)

27.     On information and belief, Berkeley also sells the Culture Station™ System for use with the Beacon®.  Berkeley states that:

> The Culture Station lets you transfer up to 4 OptoSelect™ chips to a culture module with independent media, fluidics and software, and can be seamlessly integrated into Beacon [ ] workflows.  Run media optimization or free up your Beacon [ ] system to run other experiments during culture stages of an experiment. Once culture has completed, the OptoSelect chips can be moved back to the Beacon [ ] instruments for further analysis. This creates a seamless interface between systems and increases throughput when cell culture becomes a constraint. Parallel processing of culture while simultaneously running assays on Beacon [] reduces the product development cycle time and lowers cost, maximizing benefits to the system user. Expand your Culture Station to include capacity for up to 8 chips by linking 2 instruments together on the same computer.

(https://www.berkeleylights.com/systems/culture-station/, a true and correct copy is attached as <u>Exhibit 11</u>.)

9

28.     On information and belief, Berkeley provides instruction and support to customers on how to use the Beacon®, and related reagents, software, and Culture Station™ System. (https://techsupport.berkeleylights.com/, a true and correct copy is attached as Exhibit 12.)

29.     On information and belief, Berkeley advertises and promotes the use of the Beacon® in conjunction with the reagents, software, and Culture Station™ System it also sells. (*Id.*)

30.     On information and belief, in addition to selling the Beacon® that embodies the technology claimed in the Patents-in-Suit, and related reagents, software, and culture systems directly to consumers, Berkeley also provides services to customers and partners using the Beacon®.

31.     Berkeley makes, uses, offers for sale, sells, and/or imports the Beacon® into the United States. (*See e.g.,* https://www.berkeleylights.com/systems/beacon/, a true and correct copy is attached as Exhibit 6.)

32.     Berkeley's activities outlined above, and identified further below, directly and indirectly infringe the Patents-in-Suit.

**D.  Correspondence Between AbCellera and Berkeley**

33.     On October 3, 2019, AbCellera wrote to Berkeley putting it on notice of AbCellera's patent estate concerning microfluidic single cell workflows for antibody discovery and clone selection.

34.     On December 30, 2019, Berkeley responded to AbCellera's October 3 letter, but did not dispute that AbCellera's patent estate covered Berkeley's activities or the use of the Beacon®.

35.     On January 28, 2020, AbCellera wrote to Berkeley, reiterating the scope of AbCellera's patent estate and pointing out that Berkeley employee Dr. Singhal had publicly

discussed the attributes of Berkeley's microfluidic devices, and did not dispute that AbCellera's patent estate covered Berkeley's activities or the use of the Beacon®. AbCellera pointed out that Dr. Singhal is intimately familiar with AbCellera and AbCellera's patent estate as a named inventor on the Patents-in-Suit and former graduate student of AbCellera's CEO, Dr. Carl Hansen. Dr. Singhal has assigned all of his rights in the Patents-in-Suit which are exclusively licensed to AbCellera. Given his prior role in the development of AbCellera's inventions and his roles in developing the Beacon® and as the Product Manager for the Beacon®, his knowledge is attributable to Berkeley. AbCellera further invited Berkeley to discuss the content of its letters.

36.    On February 25, 2020, Berkeley responded to AbCellera's January 28 letter stating that it did not see any freedom to operate issues, but failed to provide any substantiating details.

37.    On April 28, 2020, AbCellera again put Berkeley on notice of AbCellera's patent estate concerning microfluidic single cell workflows for antibody discovery and clone selection. AbCellera also explained that Berkeley's marketed single-cell workflows are covered by AbCellera's patent estate. AbCellera again invited Berkeley to discuss the content of its letters.

38.    Berkeley never responded to AbCellera's April 28 letter.

39.    On July 9, 2020, AbCellera filed a complaint against Berkeley asserting infringement under 35 U.S.C §§ 271(a)-(c) of the following U.S. Patents: 10,107,812, 10,274,494, 10,466,241, 10,578,618, 10,697,962, 10,087,408, 10,421,936, and 10,704,018. On August 25, 2020. AbCellera filed a second complaint against Berkeley asserting infringement under 35 U.S.C §§ 271(a)-(c) of U.S. Patents Nos. 10,718,768, 10,738,270, 10,746,737, and 10,753,933. These patents are related to the Patents-in-Suit.   On September 1, 2020 and on September 4, 2020, Plaintiffs amended these complaints respectively to add UBC as a party.

## COUNT I
## INFRINGEMENT OF THE '376 PATENT

40.     The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

41.     Berkeley directly infringes , at least claim 1 of the '376 patent by making, using, offering for sale, selling, and/or importing the Beacon® into the United States.

42.     The use of the Beacon® meets every limitation of at least claim 1 and Berkeley directly infringes at least claim 1 when using the Beacon® in violation of 35 U.S.C. § 271(a).

43.     Claim 1 of the '376 patent recites:

> 1. A method of assaying for a binding interaction between an antibody secreted by a single antibody secreting cell (ASC) and an antigen, the method comprising:
>
> retaining the single ASC within a chamber having a volume of less than 500 pL, a solid wall, and an aperture that defines an opening of the chamber;
>
> incubating the single ASC within the chamber to produce a secreted antibody;
>
> bringing a first fluid volume comprising the antigen in fluid communication with the secreted antibody;
>
> exposing the secreted antibody to a removable capture substrate, wherein the removeable capture substrate is in fluid communication with the secreted antibody and wherein the removeable capture substrate is operable to bind the secreted antibody;
>
> incubating the secreted antibody with the removeable capture substrate to produce a bound antibody; and
>
> measuring a binding interaction between the secreted antibody and the antigen.

44.     On information and belief, the use of Berkeley's Beacon® includes assaying for a binding interaction between an antibody secreted by a single ASC and an antigen.  (*See e.g.,* ¶¶ 15-32.)

45.     On information and belief, the use of Berkeley's Beacon® includes retaining the single ASC within a chamber having a volume of less than 500 pL, a solid wall, and an aperture that defines an opening of the chamber, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

46.     On information and belief, the use of Berkeley's Beacon® includes incubating the single ASC within the chamber to produce a secreted antibody, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

47.     On information and belief, the use of Berkeley's Beacon® includes bringing a first fluid volume comprising the antigen in fluid communication with the secreted antibody, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

48.     On information and belief, the use of Berkeley's Beacon® includes exposing the secreted antibody to a removeable capture substrate, wherein the removeable capture substrate is in fluid communication with the secreted antibody and wherein the removeable capture substrate is operable to bind the secreted antibody, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

49.     On information and belief, the use of Berkeley's Beacon® includes incubating the secreted antibody with the removeable capture substrate to produce a bound antibody, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

50.     On information and belief, the use of Berkeley's Beacon® includes measuring a binding interaction between the secreted antibody and the antigen, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

51.     Berkeley also indirectly infringes the claims of the '376 patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

52.     On information and belief, in violation of 35 U.S.C. § 271(b), Berkeley specifically intends to induce infringement of the '376 patent by its customers and users of the Beacon® and has knowledge that its acts will cause infringement or is willfully blind to the possibility that its acts will cause infringement.

53.     Berkeley has known of the '376 patent at least as of the date of this Complaint, as well as by virtue of inventor Singhal.    On information and belief, Berkeley's customers directly infringe the '376 patent.

54.     On information and belief, Berkeley specifically intends for its customers to infringe the '376 patent.  Berkeley encourages infringement by its customers at least by offering to sell and selling the Beacon® and providing instructions to users on how to use the Beacon®, which directly infringes the '376 patent.

55.     On information and belief, despite Berkeley's knowledge of the '376 patent and knowledge that its customers will necessarily infringe the '376 patent when the Beacon® is used as instructed, Berkeley encourages infringement.

56.     Berkeley also contributes to infringement of the '376 patent by its customers in violation of 35 U.S.C. § 271(c).  On information and belief, Berkeley offers to sell and sells the Beacon® within the United States knowing that it constitutes a material part of the claimed inventions, knowing that the Beacon® is especially made or especially adapted for use in infringing the '376 patent, and knowing that the Beacon® is not a staple article or commodity of commerce suitable for substantial non-infringing use.

57.     Berkeley commits all the above acts of infringement without license or authorization.

58.     Plaintiffs have complied with the requirements of 35 U.S.C. § 287 by, among other things, giving actual notice to Berkeley by, *inter alia*, AbCellera's letters and this Complaint.

59.     Berkeley has had knowledge of the '376 patent and the application from which it issued, including the published application with substantially identical claims.

60.    As a result of Berkeley's infringement of the '376 patent, Plaintiffs have suffered damages and will continue to suffer damages.

61.    On information and belief, the infringement of the '376 patent by Berkeley is willful.   Berkeley has had knowledge that the Beacon® is covered by the '376 patent.   On information and belief, Berkeley, with assistance from inventor Singhal, copied the '376 patent despite knowing that the Beacon® is covered by the '376 patent.   Berkeley has thus sold the Beacon® knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Berkeley.   Despite this risk, Berkeley infringes in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiffs' patent rights.   Thus, Berkeley's infringing actions are consciously wrongful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284.

62.    Under 35 U.S.C. § 283, Plaintiffs are entitled to a permanent injunction against further infringement. Berkeley's wrongful conduct causes and will cause Plaintiffs to suffer irreparable harm resulting from the loss of its lawful patent right to exclude others from making, using selling, offering to sell, and/or importing Plaintiffs' patented inventions.   On information and belief, Berkeley will continue to infringe the '376 patent unless permanently enjoined by the Court.

## COUNT II
## INFRINGEMENT OF THE '377 PATENT

63.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

64.    Berkeley directly infringes  at least claim 1 of the '377 patent by making, using, offering for sale, selling, and/or importing the Beacon® into the United States.

65.     The use of the Beacon® meets every limitation of at least claim 1 and Berkeley directly infringes at least claim 1 when using the Beacon® in violation of 35 U.S.C. § 271(a).

66.     Claim 1 of the '377 patent recites:

> 1. A method of assaying a secreted monoclonal antibody produced by a single antibody producing cell (APC) and an antigen, the method comprising:
>
> retaining the single APC within a chamber having a volume of from 100 pL to 100 nL, a solid wall, and an aperture that defines an opening of the chamber;
>
> incubating the single APC within the chamber to produce a secreted monoclonal antibody;
>
> exposing the secreted monoclonal antibody to a first removeable capture substrate bound to an antigen
>
> determining whether the secreted monoclonal antibody binds the antigen;
>
> lysing the single APC and capturing the nucleic acids of the single APC on a second removeable capture substrate.

67.     On information and belief, the use of Berkeley's Beacon® includes assaying a secreted monoclonal antibody produced by a single APC and an antigen.  (*See e.g.,* ¶¶ 15-32.)

68.     On information and belief, the use of Berkeley's Beacon® includes retaining the single APC within a chamber having a volume of from 100 pL to 100 nL, a solid wall, and an aperture that defines an opening of the chamber, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

69.     On information and belief, the use of Berkeley's Beacon® includes incubating the single APC within the chamber to produce a secreted monoclonal antibody, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

70.     On information and belief, the use of Berkeley's Beacon® includes exposing the secreted monoclonal antibody to a first removeable capture substrate bound to an antigen, or an equivalent thereof.  (*See e.g.,* ¶¶ 15-32.)

71. On information and belief, the use of Berkeley's Beacon® includes determining whether the secreted monoclonal antibody binds the antigen, or an equivalent thereof. (*See e.g.,* ¶¶ 15-32.)

72. On information and belief, the use of Berkeley's Beacon® includes lysing the single APC and captures the nucleic acids of the single APC on the removeable capture substrate, or an equivalent thereof. (*See e.g.,* ¶¶ 15-32.)

73. Berkeley also indirectly infringes the claims of the '377 patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

74. On information and belief, in violation of 35 U.S.C. § 271(b), Berkeley specifically intends to induce infringement of the '377 patent by its customers and users of the Beacon® and has knowledge that its acts will cause infringement or is willfully blind to the possibility that its acts will cause infringement.

75. Berkeley has known of the '377 patent at least as of the date of this Complaint, as well as by virtue of inventor Singhal.   On information and belief, Berkeley's customers directly infringe the '377 patent.

76. On information and belief, Berkeley specifically intends for its customers to infringe the '377 patent.  Berkeley encourages infringement by its customers at least by offering to sell and selling the Beacon® and providing instructions to users on how to use the Beacon®, which directly infringes the '377  patent.

77. On information and belief, despite Berkeley's knowledge of the '377 patent and knowledge that its customers will necessarily infringe the '377 patent when the Beacon® is used as instructed, Berkeley encourages infringement.

78.     Berkeley also contributes to infringement of the '377 patent by its customers in violation of 35 U.S.C. § 271(c).  On information and belief, Berkeley offers to sell and sells the Beacon® within the United States knowing that it constitutes a material part of the claimed inventions, knowing that the Beacon® is especially made or especially adapted for use in infringing the '377 patent, and knowing that the Beacon® is not a staple article or commodity of commerce suitable for substantial non-infringing use.

79.     Berkeley commits all the above acts of infringement without license or authorization.

80.     Plaintiffs have complied with the requirements of 35 U.S.C. § 287 by, among other things, giving actual notice to Berkeley by, *inter alia*, AbCellera's letters and this Complaint.

81.     Berkeley has had knowledge of the '377 patent and the application from which it issued, including the published application with substantially identical claims.

82.     As a result of Berkeley's infringement of the '377 patent, Plaintiffs have suffered damages and will continue to suffer damages.

83.     On information and belief, the infringement of the '377 patent by Berkeley is willful.  Berkeley has had knowledge that the Beacon® is covered by the '377 patent.  On information and belief, Berkeley, with assistance from inventor Singhal, copied the '377 patent despite knowing that the Beacon® is covered by the '377 patent.  Berkeley has thus sold the Beacon® knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Berkeley.  Despite this risk, Berkeley deliberately infringes in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiffs' patent rights.  Thus, Berkeley's infringing actions are consciously wrongful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284.

84.     Under 35 U.S.C. § 283, Plaintiffs are entitled to a permanent injunction against further infringement. Berkeley's wrongful conduct will continue to cause Plaintiffs to suffer irreparable harm resulting from the loss of its lawful patent right to exclude others from making, using selling, offering to sell, and/or importing Plaintiffs' patented inventions.  On information and belief, Berkeley will continue to infringe the '377 patent unless permanently enjoined by the Court.

## COUNT III
## INFRINGEMENT OF THE '378 PATENT

85.     The allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein.

86.     Berkeley directly infringes  at least claim 1 of the '378 patent by making, using, offering for sale, selling, and/or importing the Beacon® into the United States.

87.     The use of the Beacon® meets every limitation of at least claim 1 and Berkeley directly infringes at least claim 1 when using the Beacon® in violation of 35 U.S.C. § 271(a).

88.     Claim 1 of the '378 patent recites:

1. A method of assaying a secreted monoclonal antibody produced by a single antibody producing cell (APC) and an antigen, the method comprising:

retaining the single APC within a chamber having a volume of from 100 pL to 100 nL, a solid wall, and an aperture that defines an opening of the chamber;

incubating the single APC within the chamber to produce a secreted monoclonal antibody;

exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein first the removeable capture substrate is in fluid communication with the secreted monocolonal antibody and wherein the first removeable capture substrate is capable of binding the secreted monoclonal antibody;

incubating the secreted monoclonal antibody with the first removeable capture substrate to produce a bound antibody;

exposing a first fluid volume comprising the antigen in fluid communication with the bound antibody.

determining whether the bound antibody binds the antigen; and

> lysing the single APC and capturing the nucelic acids of the single APC on a second removeable capture substrate.

89.     On information and belief, the use of Berkeley's Beacon® includes assaying a secreted monoclonal antibody produced by a single APC and an antigen.  (*See e.g., ¶¶* 15-32.)

90.     On information and belief, the use of Berkeley's Beacon® includes retaining the single APC within a chamber having a volume of from 100 pL to 100 nL, a solid wall, and an aperture that defines an opening of the chamber, or an equivalent thereof.  (*See e.g., ¶¶* 15-32.)

91.     On information and belief, the use of Berkeley's Beacon® includes incubating the single APC within the chamber to produce a secreted monoclonal antibody, or an equivalent thereof.  (*See e.g., ¶¶* 15-32.)

92.     On information and belief, the use of Berkeley's Beacon® includes exposing the secreted monoclonal antibody to a first removeable capture substrate, wherein first the removeable capture substrate is in fluid communication with the secreted monoclonal antibody and wherein the first removeable capture substrate is capable of binding the secreted monoclonal antibody, or an equivalent thereof .  (*See e.g., ¶¶* 15-32.)

93.     On information and belief, the use of Berkeley's Beacon® includes incubating the secreted monoclonal antibody with the first removeable capture substrate to produce a bound antibody, or an equivalent thereof.  (*See e.g., ¶¶* 15-32.)

94.     On information and belief, the use of Berkeley's Beacon® includes exposing a first fluid volume comprising the antigen in fluid communication with the bound antibody, or an equivalent thereof.  (*See e.g., ¶¶* 15-32.)

95.     On information and belief, the use of Berkeley's Beacon® includes determining whether the bound antibody binds the antigen, or an equivalent thereof.  (*See e.g., ¶¶* 15-32.)

96.     On information and belief, the use of Berkeley's Beacon® includes lysing the single APC and capturing the nucleic acids of the single APC on a second removeable capture substrate, or an equivalent thereof.  (*See e.g.*, ¶¶ 15-32.)

97.     Berkeley also indirectly infringes the claims of the '378 patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

98.     On information and belief, in violation of 35 U.S.C. § 271(b), Berkeley specifically intends to induce infringement of the '378 patent by its customers and users of the Beacon® and has had knowledge that its acts will cause infringement or is willfully blind to the possibility that its acts will cause infringement.

99.     Berkeley has known of the '378 patent at least as of the date of this Complaint, as well as by virtue of inventor Singhal.  On information and belief, Berkeley's customers directly infringe the '378 patent.

100.    On information and belief, Berkeley specifically intends for its customers to infringe the '378 patent.  Berkeley encourages infringement by its customers at least by offering to sell and selling the Beacon® and providing instructions to users on how to use the Beacon®, which directly infringes the '378  patent.

101.    On information and belief, despite Berkeley's knowledge of the '378 patent and knowledge that its customers will necessarily infringe the '378 patent when the Beacon® is used as instructed, Berkeley encourages infringement.

102.    Berkeley also contributes to infringement of the '378 patent by its customers in violation of 35 U.S.C. § 271(c).  On information and belief, Berkeley offers to sell and sells the Beacon® within the United States knowing that it constitutes a material part of the claimed

inventions, knowing that the Beacon® is especially made or especially adapted for use in infringing the '378 patent, and knowing that the Beacon® is not a staple article or commodity of commerce suitable for substantial non-infringing use.

103.    Berkeley commits all the above acts of infringement without license or authorization.

104.    Plaintiffs have complied with the requirements of 35 U.S.C. § 287 by, among other things, giving actual notice to Berkeley by, *inter alia*, AbCellera's letters and this Complaint.

105.    Berkeley has had knowledge of the '378 patent and the application from which it issued, including the published application with substantially identical claims.

106.    As a result of Berkeley's infringement of the '378 patent, Plaintiffs have suffered damages and will continue to suffer damages.

107.    On information and belief, the infringement of the '378 patent by Berkeley is willful.  Berkeley has had knowledge that the Beacon® is covered by the '378 patent.  On information and belief, Berkeley, with assistance from inventor Singhal, copied the '378 patent despite knowing that the Beacon® is covered by the '378 patent.  Berkeley has thus sold the Beacon® knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Berkeley.  Despite this risk, Berkeley deliberately infringes in a wanton, malicious, and egregious manner, with reckless disregard for Plaintiffs' patent rights.  Thus, Berkeley's infringing actions are  consciously wrongful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284.

108.    Under 35 U.S.C. § 283, Plaintiffs are entitled to a permanent injunction against further infringement. Berkeley's wrongful conduct will cause Plaintiffs to suffer irreparable harm resulting from the loss of its lawful patent right to exclude others from making, using selling,

offering to sell, and/or importing Plaintiffs' patented inventions.  On information and belief, Berkeley will continue to infringe the '378 patent unless permanently enjoined by the Court.

## JURY DEMAND

109.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury of all issues so triable.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in favor of Plaintiffs and against Berkeley as follows:

a.    A judgment that the Patents-in-Suit are directly and indirectly infringed by Berkeley's manufacture, offers to sell, sales, or uses of the Beacon® within the United States, or importation into the United States, including without limitation, that practice one more of the inventions claimed in the Patents-in-Suit;

b.    An order permanently enjoining Berkeley, its affiliates and subsidiaries, and each of its officers, agents, servants, and employees and those acting in privity or concert with them, from making, using, offering to sell, selling, or importing products or processes claimed in any of the claims of the Patents-in-Suit, and from causing or encouraging others to use, sell, offer for sale, or import products or processes that infringe any claim of the Patents-in-Suit, until after the expiration dates of the Patents-in-Suit, including any extensions and/or additional periods of exclusivity to which Plaintiffs are or may become entitled;

c.    An order awarding damages under 35 U.S.C. § 284 in an amount sufficient to compensate Plaintiffs for their damages arising from infringement by Berkeley, including, but not limited to, lost profits and/or a reasonable royalty (including

under 35 U.S.C. § 154(d)), together with pre-judgment and post-judgment interest, and costs;

d.      An order awarding treble damages for willful infringement by Berkeley, pursuant to 35 U.S.C. § 284;

e.      An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through the Court's decision regarding the imposition of a permanent injunction;

f.      A judgment declaring that this case is exceptional and awarding Plaintiffs their reasonable costs and attorneys' fees pursuant to 35 U.S.C. § 285; and

g.      Such other relief as this Court or a jury may deem proper and just under the circumstances.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Karen Jacobs
_____
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
cclark@mnat.com

*Attorneys for Plaintiffs*
*AbCellera Biologics Inc. and The University of British Columbia*

OF COUNSEL:

F. Dominic Cerrito
Angus Chen
Eric Stops
Brian Biddinger
Quinn Emanuel Urquhart
 & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

September 16, 2020

24